RECEIVED THRU EMAIL

MAY 12, 2020

Bernard A. Friedman
U.S. District Judge

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

---

UNITED STATES OF AMERICA,

      Plaintiff.

vs.

TERRENCE MATTHEWS

      Defendant.

Case No. 11CR20790-1
Honorable : Benard A. Friedman

---

## MOTION FOR COMPASSIONATE RELEASE

Now comes the Defendant Terrence Matthews acting in Forma Pauperis and respectfully moves this Honorable Court for compassionate release pursuant to 18 U.S.C. 3582(c)(1)(A).

## I. INTRODUCTION

There are currently 39 inmates and 34 staff members confirmed cases of COVID-19 at FCI Elkton. Id. This is certainly an undercount prisoners are not being routinely tested. On Friday, April 3, 2020, Attorney General William Barr issued a memorandum finding that emergency conditions due to the COVID-19 pandemic "are materially affecting the functioning of the Bureau of Prisons." Exhibit B. The memo acknowledges the Bureau is "experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton."

1

<u>DEFENDANT'S BIO</u>

The Defendant Terrence Matthews #44040-039 is a 46 year old African American Male. Currently confined at FCI Elkton  serving a 120 month sentence for 21 USC 846 and 841 (A) (1) and 21 USC 841 (B) (1) (A) Conspiracy to possess with intent to distribute. The Defendant release date is March 11, 2021.  The Defendants' release plan is to live with his Mother in Detroit; Ms. Cynthia Matthews; 13946 Whitcomb, Detroit, MI. 48227. While Defendant case is  serious, it does not warrant a potential sentence of death.

COVID-19 is out of control at FCI Elkton placing all of the inmates and staff at great risk. Accordingly, compassionate release would result in slight reduction in  the overall sentence in exchange for potentially saving Defendant's life.

## II. COMPASSIONATE RELEASE

President Trump signed the First Step Act into law on December 21, 2018. Among the changes in the law, Congress amended the provision on compassionate release, 18 U.S.C. § 3582(c)(1)(A)(i). The law provides the sentencing judge with jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582 (c) (1)(A); see also First Step Act of 2018, sec 603(b), Pub. L. 115-391. 132Stat. 5194, 5239 (Dec. 21. 2018). Prior to passage of the First Step Act only the Director of the Bureau of Prisons had the authority to file a motion for compassionate release.

2

This Court has discretion to reduce the term of imprisonment imposed in this case based on § 3582(c)(1)(A)(i), which states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

As noted above, normally the Court cannot consider a compassionate release motion filed by the defendant unless "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" 18 U.S.C. § 3582(c) (1) (A) Regardless,  the exhaustion requirement can be excused and should be excused in this case. The Defendant  Terrence Matthews did however submitted his request for compassionate release to Warden Williams on April 5th, 2020 and was denied on April 20th, 2020.

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019). "In determining

whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion. Administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (cleaned up).

The Supreme Court has identified three "broad sets of circumstances" in which exhaustion of administrative remedies are excused. First, if exhaustion would cause "undue prejudice" to the individual. *Id*. at 146. "Even where the administrative decision making schedule is otherwise reasonable and definite, a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *Id* at 147; *Iddir v. I.N.S.*, 301 F.3d 492, 498 (7th Cir. 2002) (exhaustion of administrative remedies excused if insisting on exhaustion "causes prejudice"). Second, exhaustion is excused if the agency does not have the power to grant the requested relief. Third, exhaustion is excused if "the administrative body is shown to be biased or has otherwise predetermined the issue before it." *Id*.

Many district judges have found the immediate danger of serious illness or death from COVID-19 justifies excusing exhaustion of the compassionate release statute's administrative exhaustion requirement. *United States v. Haney*, --F.Supp.3d--, 2020 WL 1821988 (S.D.N.Y. April 13, 2020); *United States v. Colvin*, No. 3:19cr179 (JBA), ECF No. 38 at 2-4 (D. Conn. April 2, 2020); *United States v. Perez*, No. 17cr513-3 ECF No. 98 at 3-4

(S.D.N.Y. Apr. 1, 2020); *United States v. Powell*, No. 1:94-cr-316(ESH), ECF No. 98 (D.D.C. Mar. 28, 2020). Defendant highly recommends Judge Jed Rakoff's opinion in *Haney* as an excellent discussion of why § 3582(c)(1)(A)'s exhaustion requirement is waivable.

The alarming rise in the number of COVID-19 cases in the BOP show the danger all inmates face from the virus. The chart attached as Exhibit C shows the exponential growth in COVID-19 cases in the BOP. Every BOP inmate is now, right now, at serious risk of contracting the virus.

### IV. COVID-19 Is an Extraordinary and Compelling Reason for an Immediate Sentence Reduction to Time Served.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," Black's Law Dictionary (11th ed. 2019). Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.* The present global pandemic is a quintessential extraordinary circumstance beyond what most Americans have experienced in their lifetimes and provides a compelling reason for Defendant's immediate release.

    *1.   The Court Has Authority to Find Extraordinary and Compelling Reasons Other than Those Expressly Identified in Commentary to U.S.SG. sec. 1B1.3.*

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides

examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

However, the policy statement was last amended in November 2018, before the First Step Act was passed, and it still requires a motion filed by the BOP. For that reason, "a growing number of district courts have concluded the Commission lacks" a policy statement applicable to the post-First Step Act statute. *United States v. Mondaca*, No. 89-CR-0655 DMS, 2020 WL 1029024 (S.D. Cal. Mar. 3, 2020) (internal quotation marks omitted); *see also United States v. Brown*, 411 F. Supp. 3d 446, 449-50 (S.D. Iowa 2019) (citing cases). In *United States v. Cantu*, the Court explained:

> Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582.

No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (emphasis in original). Similarly, in *Redd*, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants." 2020 WL 1248493, at *6. Therefore, the court concluded, "there

does not currently exist, for the purpose of satisfying the First Step Act's 'consistency' requirement, an applicable policy statement.'" *Id.*

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of amendment, they have held that judges have authority based on the catch-all provision in Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See, e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019) (stating that the existing policy statement provides "helpful guidance," but "is not ultimately conclusive given the statutory change"). In *Redd*, the court explained that "Application Note 1(D)'s prefatory language, which requires a determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance." 2020 WL 1248493, at *7 (citing cases); *see also United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) ("[A] majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it." (internal quotation marks omitted)).

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's

categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.*[2]

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13 commentary.

> 2.   *COVID-19 Is an Unprecedented and Rapidly-Expanding Global Health Emergency that Presents a Serious Risk to Vulnerable Prisoners.*

On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic. *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS. "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death. Declaration, Chris Beyrer, MD, MPH, Professor of Epidemiology, Johns Hopkins Bloomberg School of Public Health, ¶ 5 (Mar. 16, 2020) (Attachment A). The current best

---

[2] *See also United States v. O'Bryan*, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); *United States v. Maumau*, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 (D. Utah Feb. 18, 2020) ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law) (citing ten other cases); *Brown*, 411 F. Supp. 3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i).").

estimate is that the fatality rate among all demographics "is 5-35 times the fatality associated with influenza infection." Beyrer Dec. ¶ 5.[3]

COVID-19 has infected more than 2.2million people worldwide, leading to more than 153,000 deaths. *Coronavirus COVID-19 Global Cases*, Center for Systems Science and Engineering (CSSE) at Johns Hopkins University,  (last visited April 17, 2020, at 4:50 p.m.) (updating regularly). On March 26, 2020, the United States became the global leader in COVID infections. Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, Business Insider (Mar. 26, 2020), . The number of confirmed COVID-19 cases continues to rise exponentially, but reported numbers underrepresent the true scope of the crisis—"experts believe that the United States still isn't testing enough people to detect the outbreak's true spread." Alexis C. Madrigal & Robinson Meyer, *How the Corona virus Became an American Catastrophe*, The Atlantic (Mar. 21, 2020);

*The severity of the corona virus pandemic is reflected in the actions of local and national leaders, who have taken drastic measures to prevent the spread of the disease. All 50 states and the national government have declared states of emergency.

---

[3] *See also* Nick Wilson et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26 EID JOURNAL (prepublication June 2020), *See also: United States of America vs. Dennis Coles Case#No. 00-cr-20051 at page 20-21; decided April 24, 2020. Judge Sue E. Myerscough; (Elkton Facility)  * [attached hereto as Exhibit -D-] ;

*See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020),. Kamran Rahman & Alice Miranda Ollstein, *How States Are Responding to Coronavirus, in 7 Maps*, Politico (Mar. 24, 2020), Additionally, more than half of the states and the District of Columbia have imposed severe "lockdown" rules for their citizens. Porter, *supra*.  Conditions of imprisonment create the ideal environment for the transmission of contagious diseases. Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (2007), "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020),   The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions. *Id.*

Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease in jails and prisons. Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (Mar. 13, 2020), Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA Journal (Mar. 13, 2020), Additionally, incarcerated people tend to be in poorer health than the general population. According to a recent Bureau of Justice Statistics study, approximately half of state and federal prisoners and jail inmates have chronic conditions such as cancer, high blood pressure, diabetes, cirrhosis of the liver, heart disease, and asthma. Laura M. Maruschak et al., *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12*, Bureau of Justice Statistics, NCJ 248491, 1 (Rev. Oct. 4, 2016), Medical care of prisoners is limited at the best of times.[4]

---

[4] *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016), (finding that the BOP experienced chronic medical staff shortages and failed to take adequate measures to address them, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of

Because of these dangers, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and the health of the community as a whole:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Beyrer Declaration, ¶¶ 17, 19. "We need to take the unprecedented step TODAY of providing urgent release to everyone in the jails who is at risk of serious morbidity and mortality from COVID." Jennifer Gonnerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Coronavirus*, The New Yorker (Mar. 20, 2020) (quoting Rachael Bedard, Rikers Island Geriatrician).

Similarly, on March 23, 2020, a bipartisan group of fourteen senators wrote to Attorney General Barr and the Director of the Bureau of Prisons to express "serious concern for the health and wellbeing" of those inmates "most vulnerable to infection." Letter from Senator Charles Grassley et al. (Mar. 23, 2020) (Attachment B). They noted that "[c]onditions of confinement do not afford individuals the opportunity to take

---

institutions); U.S. Dep't of Justice Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (Rev. Feb. 2016),  (finding that BOP facilities and services, including medical services, were inadequate to meet the needs of an aging prison population leading to delays in medical treatment for prisoners with acute and chronic heart and neurological conditions, who wait an average of 114 days to see medical specialists); David Patton, S*tatement from Federal Defenders of New York*, FEDERAL DEFENDERS OF NEW YORK (Mar. 8, 2020),

proactive steps to protect themselves, and prisons often create the ideal environment for the transmission of contagious disease." *Id.* The senators called on the BOP to use existing tools like the elderly prisoner home confinement program and compassionate release to discharge vulnerable inmates from prison. *Id.*

As of April 17, 2020, the BOP's COVID-19, Coronavirus webpage, which is updated daily at 3:00 p.m., shows 465 inmates and 296 staff members with confirmed cases of COVID-19. (last visited April 17, 2020). Eighteen inmates have died from COVID-19, six of those inmates from FCI Elkton. And these are just the confirmed infections. As the judge in *United States v. Caddo* noted, "it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets." Order at 5, *United States v. Caddo*, No. 3:18-cr-08341-JJT (D. Ariz. Mar. 23, 2020) (ECF No. 174).

3. *Defendant Runs a High Risk of Serious Illness or Death if He Contracts Covid-19*

The CDC and other medical authorities have made clear that COVID-19 is especially dangerous for people with severe chronic medical conditions. *See* CDC, *Older Adults* (Mar. 21, 2020).

On April 8, 2020, the CDC issued a study entitled "Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory Confirmed Corna virus Disease 2019—COVID-NET, 14 States, March 1-30, 2020.

The study looked at the demographics of patients who were hospitalized with laboratory confirmed COVID-19 infections from March 1, through March 30, 2020, as reported by hospitals across the country. The study found the hospitalization rate for people over 65 years of age is 13.8 per 100,000 with the rate jumping to 17.2 for those over age 85. That compares to a hospitalization rate for flu of 2.2-5.4 per 100,000 for individuals over 85 years of age. Approximately 90% of hospitalized patients had at least one underlying conditions with the most common being obesity, hypertension, chronic lung disease, diabetes mellitus, and cardiovascular disease. More men than women are being hospitalized and the data suggests "that black populations might be disproportionately affected by COVID-19.

## DEFENDANT MEDICAL CONCERN

The Defendant suffers from Asthma and is medically prescribed a steroid inhaler to assist in his breathing. While Defendant is among those with the highest risk of death or serious illness from COVID-19, as a Bureau of Prisons inmate, it is impossible for him to follow the CDC's recommendations to protect himself from exposure to this highly-transmissible disease. This risk of serious illness or death from the unprecedented global pandemic, together with all of the other relevant factors in this case, presents an extraordinary and compelling basis for sentence reduction.

V. Courts Responding to the Coronavirus Pandemic Have Recognized the Critical Importance of Reducing Incarcerated Populations.

The Court response to COVID-19 reflects the extreme exigency of the present circumstances, especially for those individuals most vulnerable to harm from the virus. In *United States v. Garlock*, for example, the district court extended the defendant's date for surrendering to serve an already-imposed prison sentence until September 1, 2020, concluding that no one should be entering BOP custody absent "truly extraordinary circumstances":

> By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. . . . The chaos has already begun inside federal prisons—inmates and prison employees are starting to test positive for the virus, quarantines are being instituted, visits from outsiders have been suspended, and inmate movement is being restricted even more than usual. . . . To avoid adding to the chaos and creating unnecessary health risks, offenders who are on release and scheduled to surrender to the Bureau of Prisons in the coming months should, absent truly extraordinary circumstances, have their surrender dates extended until this public health crisis has passed.

No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020).

In *United States v. Copeland*, the Court granted a sentence reduction to time served under another portion of the First Step Act to a defendant serving a life sentence for a drug trafficking conspiracy and firearm possession. No. 2:05-cr-00135-DCN (D.S.C. condition" put him at "even higher risk for severe illness and possible death" from the COVID-19 pandemic. *Id.* at 7.

15

The court considered letters from members of Congress as evidence of its "desire for courts to 'use all available powers and authorities ... to reduce the number of federal prisoners in ... prisons,'" especially for elderly and sick individuals and those within the last 36 months of their sentences who are appropriate for placement in home confinement. *Id.* (quoting Letter of House Judiciary Committee, Mar. 19, 2020).

Similarly, in *Toledo-Manrique*, the district court granted bail in an extradition matter, although the individual faced a life sentence in Peru. 2020 WL 1307109, at *1. Noting that Toledo-Manrique is 74 years old, the Court concluded, "[t]he risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail." *Id.*

A sampling of the court orders granting release based on the pandemic fails to convey the full volume of building precedent. *See, e.g.*, *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *1 (E.D. Mich. Mar. 27, 2020) ("[T]he danger posed to Defendant in the Saginaw County Jail by the COVID-19 pandemic constitutes an independent compelling reason to temporarily release him from custody."); *United States v. Michaels*, No. SACR 16-76-JVS, 2020 WL 1482553, at *1 (C.D. Cal. Mar. 26, 2020 ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i)); *United States v. Jaffee*, No. 19-cr-00088-RDM (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"); *United States v. Harris*,

No. 19-cr-00356-RDM (D.D.C. Mar. 26, 2020), ECF No.35 ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of danger incarcerating Defendants complications should    [h]e contract COVID-19"); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, __ F. Supp. 3d __, at *2 (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

*VI. With Full Consideration of the § 3553(a) Factors, Including the COVID-19 Pandemic Defendant's Time Served Constitute a Sentence Sufficient, but Not Greater than Necessary, to Accomplish the Goals of Sentencing.*

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Under all of the circumstances in this case, the Court should conclude that the time that Defendant has already served is sufficient to satisfy the purposes of sentencing. Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can  indeed/ must consider post-offense developments under 3553 (a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents. Although the circumstances of the present offense qualified Defendant for the serious sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness. In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody. *Helling v. McKinney*, 509 U.S. 25, 28 (1993);

*see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions). The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

The totality of the circumstances demonstrate that reducing Defendant sentence to time served  is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a).  Defendant will not pose a danger to the community if granted compassionate release.

WHEREFORE, the Defendant respectfully requests that this Honorable Court "appoint counsel " to assist Defendant in pursuit of  obtaining compassionate release.

Respectfully submitted,

*Terrence Matthews*

Terrence Matthews, #44040-039
FCI Elkton
PO Box 10
Libson, Ohio

Dated: May 1, 2020

18

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health. I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions.  Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US. As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection. The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread. This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity. This again, is likely a function of all human populations currently being highly susceptible. The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations. The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure. This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.  It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release.  Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.

_____
Professor Chris Beyrer[1]

_____
[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

Exhibit A

**References**

Stuckler D, Basu S, McKee M, King I. Mass incarceration can explain population increases in TB and multi-drug resistant TB in European and Central Asian countries. Proceedings of the National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners, prisons, and HIV: time for reform. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No abstract available. PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E. Pandemic Influenza and Jail Facilities and Populations. American Journal of Public Health. 2009 October; 99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV, prisoners, and human rights. *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R. Response to COVID-19 in Taiwan: Big Data Analytics, New Technology, and Proactive Testing. March 3, 2020. *JAMA.* Published online March 3, 2020. doi:10.1001/jama.2020.3151



<div align="center">

**Office of the Attorney General**
**Washington, D. C. 20530**

</div>

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:       <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

Memorandum from the Attorney General                                                    Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions.  I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations.  You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems.  And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred.  It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities.  Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community.  I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence.  Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.    **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public.  That means we cannot simply release prison populations en masse onto the streets.  Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic.  Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates.  It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal.  It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease.  This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                           Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

Exhibit B

BOP-Reported Positive Tests for COVID-19 Nationwide[1]

| Date | Number of Positive Inmates | Number of Positive Staff | Number of Inmate Deaths |
|---|---|---|---|
| 3/19/2020 | 0 | 0 | 0 |
| 3/20/2020 | 0 | 2 | 0 |
| 3/21/2020 | 1 | 2 | 0 |
| 3/22/2020 | 1 | 2 | 0 |
| 3/23/2020 | 3 | 3 | 0 |
| 3/24/2020 | 6 | 3 | 0 |
| 3/25/2020 | 6 | 3 | 0 |
| 3/26/2020 | 10 | 8 | 0 |
| 3/27/2020 | 14 | 13 | 0 |
| 3/28/2020 | 19 | 19 | 1 |
| 3/29/2020 | 19 | 19 | 1 |
| 3/30/2020 | 28 | 24 | 1 |
| 3/31/2020 | 29 | 30 | 1 |
| 4/1/2020 | 57 | 37 | 3 |
| 4/2/2020 | 75 | 39 | 6 |
| 4/3/2020 | 91 | 50 | 7 |
| 4/4/2020 | 120 | 54 | 8 |
| 4/5/2020 | 138 | 59 | 8 |
| 4/6/2020 | 195 | 63 | 8 |
| 4/7/2020 | 241 | 72 | 8 |
| 4/8/2020 | 272 | 105 | 8 |
| 4/9/2020 | 283 | 125 | 8 |
| 4/10/2020 | 318 | 163 | 9 |
| 4/11/2020 | 335 | 185 | 9 |
| 4/12/2020 | 352 | 189 | 10 |
| 4/13/2020 | 388 | 201 | 13 |
| 4/14/2020 | 446 | 248 | 14 |
| 4/15/2020 | 451 | 280 | 16 |
| 4/16/2020 | 473 | 279 | 18 |

[1] Numbers obtained from www.bop.gov/coronavirus on a daily basis. There is good reason to believe that the numbers reported by the BOP understate the actual number of tested-positive cases. *Compare* M. Licon-Vitale, MCC Ward, and D. Edge, MDC Warden, *Response to EDNY Administrative Order 2020-14* (Apr. 7, 2020) *at* https://www.nyed.uscourts.gov/pub/bop/MDC_20200407_042057.pdf (3 positive inmates at MDC Brooklyn) *with COVID-19 Cases* Federal Bureau of Prisons (Apr. 7, 2020) *at* www.bop.gov/coronavirus (2 positive inmates at MDC Brooklyn).

Exhibit C





BOP-Reported Positive Tests for COVID-19 Nationwide
500
450
400
350
300
250
200
150
100
50
0
3/19/2020
3/20/2020
3/21/2020
3/22/2020
3/23/2020
3/24/2020
3/25/2020
3/26/2020
3/27/2020
3/28/2020
3/29/2020
3/30/2020
3/31/2020
4/1/2020
4/2/2020
4/3/2020
4/4/2020
4/5/2020
4/6/2020
4/7/2020
4/8/2020
4/9/2020
4/10/2020
4/11/2020
4/12/2020
4/13/2020
4/14/2020
4/15/2020
4/16/2020
Number of Positive Inmates
Number of Positive Staff
Number of Inmate Deaths

BOP-Reported Positive Tests for COVID-19 Nationwide
500
450
400
350
300
250
200
150
100
50
0
3/19/2020
3/20/2020
3/21/2020
3/22/2020
3/23/2020
3/24/2020
3/25/2020
3/26/2020
3/27/2020
3/28/2020
3/29/2020
3/30/2020
3/31/2020
4/1/2020
4/2/2020
4/3/2020
4/4/2020
4/5/2020
4/6/2020
4/7/2020
4/8/2020
4/9/2020
4/10/2020
4/11/2020
4/12/2020
4/13/2020
4/14/2020
4/15/2020
4/16/2020
Number of Positive Inmates
Number of Positive Staff
Number of Inmate Deaths

Exhibit C

Percentage of Increase of Infected BOP People (Inmates and Staff)

Since 3/20/2020[2]

| Date | Number of BOP Cases[3] | BOP Percentage Increase Since 3/20/2020 | National Percentage Increase Since 3/20/2020 | Number of National Cases |
|---|---|---|---|---|
| 3/20/2020 | 2 | 0% | 0% | 18,747 |
| 3/21/2020 | 3 | 50% | 31% | 24,583 |
| 3/23/2020 | 6 | 200% | 135% | 44,183 |
| 3/24/2020 | 9 | 350% | 190% | 54,453 |
| 3/26/2020 | 18 | 800% | 355% | 85,356 |
| 3/27/2020 | 27 | 1250% | 451% | 103,321 |
| 3/29/2020 | 38 | 1800% | 651% | 140,904 |
| 3/30/2020 | 52 | 2500% | 772% | 163,539 |
| 3/31/2020 | 59 | 2850% | 892% | 186,101 |
| 4/1/2020 | 94 | 4600% | 1036% | 213,144 |
| 4/2/2020 | 114 | 5600% | 1176% | 239,279 |
| 4/3/2020 | 141 | 6950% | 1379% | 277,205 |
| 4/4/2020 | 174 | 8600% | 1526% | 304,826 |
| 4/5/2020 | 197 | 9750% | 1665% | 330,891 |
| 4/6/2020 | 259 | 12850% | 1897% | 374,329 |
| 4/7/2020 | 313 | 15550% | 1963% | 386,800 |
| 4/8/2020 | 377 | 18750% | 2140% | 419,975 |
| 4/9/2020 | 408 | 20300% | 2349% | 459,165 |
| 4/10/2020 | 481 | 23950% | 2527% | 492,416 |
| 4/11/2020 | 520 | 25900% | 2704% | 525,704 |
| 4/12/2020 | 541 | 26950% | 2860% | 554,849 |
| 4/13/2020 | 589 | 29350% | 2989% | 579,005 |
| 4/14/2020 | 694 | 34600% | 3129% | 605,390 |
| 4/15/2020 | 731 | 36450% | 3274% | 632,548 |
| 4/16/2020 | 752 | 37500% | 3388% | 653,825 |

[2] National numbers obtained from www.cdc.gov and https://coronavirus.jhu.edu/map.html
[3] Includes the number of both BOP inmates and staff who have tested positive for COVID-19

Exhibit C



Exhibit C

**Johnetta Curry-Williams**

| | |
|---|---|
| **From:** | Starletta Austin <firststar32004@yahoo.com> |
| **Sent:** | Tuesday, May 12, 2020 11:19 AM |
| **To:** | Johnetta Curry-Williams |
| **Subject:** | Fw: Terrence Matthews motion |
| **Attachments:** | MOTION FOR COMPASSIONATE RELEASE DINK TEMPLATE.pdf |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Dear Mrs. Curry, Please find an email copy of the 3582 (c)(1)(A) emergency motion for a compassionate release that was mailed on May 2, 2020 for Terrence Darnell Matthews inmate # 44040-039, currently incarcerated at FCI ELKTON in Lisbon, Ohio. If you have any additional questions please feel free to contact me, my e-mail address is firststar32004@yahoo.com, thank you!

----- Forwarded Message -----
**From:** Kimberly Coles <kcoles0130@gmail.com>
**To:** "firststar32004@yahoo.com" <firststar32004@yahoo.com>
**Sent:** Saturday, May 2, 2020, 06:50:44 AM PDT
**Subject:** Terrence Matthews motion

Sent from my iPhone