UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,              CRIMINAL NO. 11-20790

v.                               HON. BERNARD A. FRIEDMAN

TERRENCE MATTHEWS,

                Defendant.

_____/

## United States' Response Opposing
## the Defendant's Motion for Compassionate Release

Over-and-over again, during the fall of 2009, the defendant Terrence Matthews engaged in numerous kilogram narcotics transactions: DEA agents arrested him in October with almost half-a-million dollars in cash that he was using to buy marijuana. Agents searched his house the following day and found more drugs—kilos of crack and powder cocaine. Neither of these encounters with law enforcement deterred him because, a month later, he sold kilos of cocaine to another drug customer. Police officers did not arrest him during this incident, but they did seize his car (which contained a secret compartment with even more drugs). This did not deter him because, about a month after that,

a drug courier was bringing him two kilos of heroin. When police stopped this courier and seized the drugs, they searched Matthews's house and found even more heroin. Matthews eventually pleaded guilty to drug trafficking and was sentenced to 120 months in prison.

Matthews began serving that sentence on October 3, 2013. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A), citing the Covid-19 pandemic and his "intermittent" (i.e., the mildest form of) asthma. But Covid-19 alone does not authorize Matthews' release. Nor does his medical condition (e.g., because he is not even in a CDC risk category for Covid-19). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way

2

to quarantine each of them for 14 days. As of May 22, 2020, these directives have already resulted in at least 3,049 inmates being placed on home confinement. *See* [BOP Covid-19 Website](BOP Covid-19 Website).

*Second*, Matthews does not qualify for compassionate release. Because Matthews has not sought compassionate release from the Bureau of Prisons based on Covid-19, as required under 18 U.S.C. § 3582(c)(1)(A), the Court does not have jurisdiction to address his Covid-19-based argument until he exhausts his administrative remedies. Nor, in any event, does Matthews satisfy the statutorily mandated criteria for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Matthews's failure to meet the criteria in USSG § 1B1.13 also forecloses relief. Even assuming a defendant facing a heightened risk from Covid-19 might satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Matthews does not have a condition that places him at higher risk from Covid-19. Matthews's offense makes him

a danger to the community, which precludes release under USSG
§ 1B1.13(2), especially because Matthews was undeterred from dealing
in kilos of narcotics despite continual interactions and encounters with
police. And the § 3553(a) factors—which the Court must also consider
under § 3582(c)(1)(A)—likewise do not support release for similar
reasons, e.g., because of the seriousness of the crime and need to
promote respect for the law.

## Background

In October 2009, Matthews and his co-conspirator, Wendell Tobias,
went to meet a person they believed would sell them 2,000 pounds of
marijuana. (PSR, ¶¶ 12-13). In fact, this person was a DEA confidential
informant. (*Id.*). So agents arrested Matthews with a suitcase
containing $447,000—a partial payment for marijuana. (*Id.*, ¶ 14).

Two days later, based on a tip, DEA agents located and searched
Matthews' Southfield apartment. (*Id.*, ¶ 17). They found over
10 kilograms of cocaine, almost two kilograms of crack cocaine, and two
handguns. (*Id.*).

Undeterred, about a month after this search warrant, Matthews gave
co-defendant Lawrence Martin five kilos of cocaine at the Splash Bar in

Detroit. (*Id.*, ¶ 18). When they searched Matthews' vehicle, they found
about 14 more kilos of cocaine. (*Id.*, ¶ 20).

Then, a few weeks later (or now in December of 2019), a courier
carrying two kilos of heroin was stopped before arriving at Matthews's
house. (*Id.*, ¶ 21). DEA later searched this house and found about two
more kilos of heroin and $40,000. (*Id.*, ¶ 23).

A grand jury indicted Matthews in December of 2011 for various
drug trafficking violations. (*Id.*, ¶ 4). He eventually pleaded guilty. (*Id.*,
¶ 6). In the negotiated plea agreement, the parties calculated his
sentencing guideline range at 135-168 months. (*Id.*, ¶ 91). The
probation department found it was higher (more specifically, 168-210
months) based on an enhancement for the firearms mentioned above.
(*Id.*, ¶ 92). This Court initially sentenced Matthews to 135 months, or
the bottom of the parties' contemplated guidelines. This sentenced was
reduced to 120 months after the drug guidelines were lowered. (R.184:
Am. Judgment, 924).

Matthews is currently incarcerated at Elkton FCI. He is 46 years old,
and his projected release date is June 19, 2022. His only relevant
medical condition is asthma. During a 2013 medical encounter with

BOP, the medical provider noted that this asthma was "well controlled." (Exhibit 1: BOP Medical Encounter on 10/9/13, sealed). And his asthma has been categorized as "mild intermittent asthma." (Exhibit 2: BOP Medical Encounter on 3/21/17, sealed). Nevertheless, Matthews has moved for compassionate release, citing this medical condition and the Covid-19 pandemic. Matthews also claims that he submitted a request for compassionate release that was denied. But records from the Bureau of Prisons do not show this request or denial.

<strong>Argument</strong>

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19

Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

   Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

At FCI Elkton, Health Services Administrator Sarah A. Dees has reported the following as it relates to Elkton FCI:

- FCI Elkton Health Services staff have "worked tirelessly to ensure that every inmate is safe from the effects of the pandemic." (Exhibit 3: Sarah A. Dees Declaration, 5/8/20, ¶ 83).

- "Staff have been on 12 hour shifts since March 29, 2020. They have provided 24-hour medical coverage since the beginning of April." (*Id.*).

- Staff have been identifying inmates who were at greater risk for Covid-19 complications and those inmates are carefully monitored for symptoms related to Covid-19. (*Id.* at ¶¶ 32-33, 85).

- Despite staff members being at risk and many of them getting sick themselves, "[c]are for the inmates has not declined during this pandemic." (*Id.* at ¶ 85).

- Smaller inmate groups have been formed at FCI Elkton by dividing inmates by housing unit, and by floor, so they can "shelter in place" with the fewest number of fellow inmates. (*Id.* at ¶ 50). Restrictions are in place to maintain separation between housing units. (*Id.*).

- FCI Elkton inmates have two masks, and must wear a mask at all times, except when they are eating or sleeping. (*Id.* at ¶ 76). FCI Elkton inmates are provided with basic soap and personal hygiene products. (*Id.* at ¶ 68). Inmates can ask for a bin of cleaning supplies to bring back to their living areas. (*Id.* at ¶ 66).

- FCI Elkton has contracted with Quest Diagnostics to test for Covid-19 with a turn-around time of between 24-48 hours. (*Id.* at ¶ 46). On May 7, 2020, Quest provided FCI Elkton with 400 test swabs and BOP anticipates an additional 150-200 tests each day after that. (*Id.*).

- Along with ongoing reviews by DOJ and BOP executive staff, a number of independent "public health officials have monitored the medical situation at FCI Elkton," including the Ohio Department of Health, the Columbian County Health Department, and local hospitals. (*Id.* at ¶ 79-82). Comparing FCI Elkton to nursing homes that house people in similar proximity, health officials have found that FCI Elkton has been more successful at stopping the spread of Covid-19. (*Id.* at ¶ 80). These health officials were impressed with

the planning done at FCI Elkton in response to the
pandemic. (*Id*. at ¶ 81).

Like all other institutions, penal and otherwise, the Bureau of
Prisons has not been able to eliminate the risks from Covid-19
completely, despite its best efforts. But the Bureau of Prisons' measures
will help federal inmates remain protected from Covid-19 and ensure
that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of
inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing
the placement of federal prisoners in home confinement. New
legislation now temporarily permits the Bureau of Prisons to "lengthen
the maximum amount of time for which [it] is authorized to place a
prisoner in home confinement" during the Covid-19 pandemic.
Coronavirus Aid, Relief, and Economic Security Act (CARES Act)
§ 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020).
The Attorney General has also issued two directives, ordering the
Bureau of Prisons to use the "various statutory authorities to grant
home confinement for inmates seeking transfer in connection with the
ongoing Covid-19 pandemic." ([03-26-2020 Directive to BOP](#), at 1; *accord*

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of
Prisons to identify the inmates most at risk from Covid-19 and "to
consider the totality of circumstances for each individual inmate" in
deciding whether home confinement is appropriate. (03-26-2020
Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical.
Over 3,174 federal inmates have been granted home confinement since
the Covid-19 pandemic began, and that number continues to grow. BOP
Coronavirus FAQs. As the Attorney General's directives have explained,
these home-confinement decisions have required evaluating several
criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease
> the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement
> would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the
Covid-19 pandemic far better than any other solution does. The Bureau
of Prisons cannot open its facilities' gates indiscriminately and unleash
tens of thousands of convicted criminals, en masse. It must focus on the

inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. And if a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451,

2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.  The Court should deny Matthews's motion for compassionate release.

Matthews's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the

administrative process within the Bureau of Prisons or waiting 30 days from when the warden at his facility received his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020). Because this requirement is a statutory one and not judicially crafted, it is mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016); *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019).

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C.

15

§ 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. The Court is barred from granting release because Matthews has not exhausted his administrative remedies.

The Court must dismiss Matthews's motion, because he has not satisfied the exhaustion requirement for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Until recently, only the Bureau of Prisons could move for compassionate release. The First Step Act of 2018 amended the statute, permitting defendants to move for it too. First Step Act § 603(b), Pub. L. No. 115-319, 132 Stat. 5194, 5239 (Dec. 21, 2018).

But the provision permitting a defendant-initiated motion includes an exhaustion requirement. *Id.* A district court may not grant a defendant's motion for compassionate release unless the defendant files it "after" the earlier of (1) the defendant "fully exhaust[ing] all

16

administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or (2) "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020).

Statutory exhaustion requirements, like the one in § 3582(c)(1)(A), are mandatory. *Ross v. Blake*, 136 S. Ct. 1850, 1856–57 (2016). As the Sixth Circuit has explained, there is a "sharp divide" that "separates statutory from prudential exhaustion." *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 751 (6th Cir. 2019). Unlike judicially crafted requirements, statutory requirements may not be excused, even to account for "special circumstances." *Ross*, 136 S. Ct. at 1856–57.

Section 3582(c)(1)(A) is likely even a *jurisdictional* bar on the Court's authority to consider a motion for compassionate release. The Sixth Circuit has labeled § 3582(c)'s limitations "jurisdiction[al]." *Williams*, 607 F.3d at 1125. The statute "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994). And it delineates "when, and under what conditions," a court may exercise its "'adjudicatory authority.'"

17

*Bowles v. Russell*, 551 U.S. 205, 212–13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005)). But even if § 3582(c)'s requirements were not considered truly jurisdictional, they would still be mandatory claim-processing rules that must be enforced when a party "properly rais[es]" them. *Eberhart*, 546 U.S. at 19 (2005). Thus, regardless of how it is labeled, § 3582(c)(1)(A)'s exhaustion requirement is mandatory. *See Ross*, 136 S. Ct. at 1856–57; *United States v. Marshall*, 954 F.3d 823, 826–29 (6th Cir. 2020).

The only court of appeals to address this question has agreed. In *United States v. Raia*, 954 F.3d 594, 595–97 (3d Cir. 2020), the Third Circuit held that the Covid-19 pandemic does not permit inmates or district judges to bypass § 3582(c)(1)(A)'s exhaustion requirement. Rather, "[g]iven BOP's shared desire for a safe and healthy prison environment, . . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Id.* at 597.

The majority of district courts to decide this question nationwide, including many in our district, have similarly held that a "failure to exhaust" under § 3582(c)(1)(A) "cannot be excused, even in light of the Covid-19 pandemic." *United States v. Alam*, No. 15-20351, 2020 WL

1703881, at *2–*3 (E.D. Mich. Apr. 8, 2020); *accord United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *2 (E.D. Mich. May 15, 2020); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020); *United States v. Mathews*, No. 14-CR-20427-02, 2020 WL 1873360, at *2–*3 (E.D. Mich. Apr. 15, 2020). As one of the those district judges has explained, the few courts that have excused exhaustion under § 3582(c)(1)(A) have mistakenly relied on cases addressing *judge-made* exhaustion requirements, not *statutory* exhaustion requirements. *Mathews*, 2020 WL 1873360, at *2–*3.

Congress's reasons for § 3582(c)(1)(A)'s exhaustion requirement apply with even greater force during the Covid-19 pandemic. The Bureau of Prisons is already responding to the pandemic—not just through heightened safety measures, but by evaluating its entire prison population for home confinement. By requiring a defendant to exhaust, § 3582(c)(1)(A) gives the Bureau of Prisons the opportunity to gather his medical documentation and other records, evaluate his request, and decide in the first instance whether it justifies either compassionate release or some other form of relief. As the Third Circuit observed: "Given BOP's shared desire for a safe and healthy prison environment,

. . . strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 954 F.3d at 597.

Matthews did not exhaust his administrative remedies. He has not made a request to the Bureau of Prisons asking that he be granted compassionate release based on his asthma and Covid-19. Matthews has therefore not satisfied § 3582(c)(1)(A)'s mandatory exhaustion requirement.

## B.   There are no extraordinary and compelling reasons to grant Matthews compassionate release.

Even if Matthews had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy

statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of

the Bureau of Prisons," which the Bureau of Prisons has set forth in

[Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1. As the Tenth

Circuit recently explained, a district court "lack[s] jurisdiction" to grant

compassionate release when a defendant's circumstances do not fall

within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of

inmate-specific condition permitting compassionate release. The Bureau

of Prisons has worked diligently to implement precautionary measures

reducing the risk from Covid-19 to Matthews and other inmates. Thus,

as the Third Circuit has explained, "the mere existence of Covid-19 in

society and the possibility that it may spread to a particular prison

alone cannot independently justify compassionate release, especially

considering BOP's statutory role, and its extensive and professional

efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

Matthews's age and medical condition, specifically, his asthma,

likewise do not satisfy the requirements for release in USSG § 1B1.13

cmt. n.1, even when considered in combination with the Covid-19

pandemic. Judge Levy recently emphasized that "asthma does not even

present among the top ten risk factors—or comorbidities—that increase

the likelihood of a dire outcome from Covid-19." *United States v. Brown*, No. 19-20202, 2020 WL 2572274, at *2 (E.D. Mich. May 21, 2020). Indeed, Matthews does not have any of the CDC risk factors for higher risk for severe illness if he contracts Covid-19. CDC does list "moderate to severe asthma" as a risk factor. There are different classifications of asthma, from intermittent to severe. As explained above, Matthews was recently diagnosed with the "intermittent" asthma—the mildest form. In other words, Matthews's age and medical records also confirm that he does not face a heightened risk from Covid-19. So whether considered alone or in combination with the Covid-19 pandemic, Matthews's age and medical condition do not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

Finally, even if the combination of Matthews's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Matthews would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the

safety of any other person or to the community, as provided in 18 U.S.C.

§ 3142(g)." It thus prohibits the release of violent offenders, including

most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 &

n.6 (6th Cir. 2010). It also bars the release of many other defendants.

An evaluation of dangerousness under § 3142(g) requires a

comprehensive view of community safety—"a broader construction than

the mere danger of physical violence." *United States v. Cook*, 880 F.2d

1158, 1161 (10th Cir. 1989) (per curiam). So even many "non-violent"

offenders—such as those who have been involved in serial or significant

fraud schemes—may not be released under § 3582(c)(1)(A). USSG

§ 1B1.13(2); *see Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*,

956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases,

encompass pecuniary or economic harm."); *United States v. Israel*, No.

17-20366, 2017 WL 3084374, at *5 (E.D. Mich. July 20, 2017)

(recognizing that "economic harm may qualify as a danger" foreclosing

release).

Adhering to § 1B1.13(2) is especially important given the current

strain on society's first responders and the rise in certain types of crime

during the Covid-19 pandemic. Police departments in many cities have

been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Matthews's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Matthews was involved in large quantity narcotics trafficking, and was undeterred despite multiple encounters with police. In other words, there is a strong likelihood that, if released, Matthews would continue his drug trafficking activities.

Matthews is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that

25

release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Matthews eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Matthews committed a serious crime, involving hundreds of thousands of dollars of narcotics and guns. And the crime was even more severe because Matthews continued his behavior despite police involvement, even his arrest with a half-a-million in cash.

## III.   If the Court were to grant Matthews's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Matthews's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Matthews's motion should be denied.

Respectfully submitted,

Matthew Schneider
United States Attorney

/s/ Steven P. Cares
Assistant United States Attorney
United States Attorney's Office
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9139
Dated: May 26, 2020          Email: steven.cares@usdoj.gov

## Certificate of Service

I hereby certify that on April 2, 2020, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

I further certify that I have mailed by U.S. mail, or otherwise provided to a representative with the United States Bureau of Prisons, the paper to the following non-ECF participants:

> Terrence Matthews
> Register No. 44040-039
> FCI Elkton
> Federal Correctional Institution
> P.O. Box 10
> Lisbon, OH  44432

> /s/ Steven P. Cares
> Assistant United States Attorney
> United States Attorney's Office
> Eastern District of Michigan
> 211 West Fort Street, Suite 2001
> Detroit, MI 48226
> Phone: (313) 226-9139
> Email: steven.cares@usdoj.gov